

EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

KEITH F. BELL, PH.D., )
Plaintiff, )
vs. ) No. 4:19-CV-01308-JST
THE OAKLAND COMMUNITY POOLS )
PROJECT, INC. and DOES 1 to )
20, )
Defendants. )
______________________________)

DEPOSITION OF KEITH F. BELL, PH.D.

THURSDAY, NOVEMBER 21, 2019

Job No. 171137

So to back up, you have been deposed before. Do you recall the rules of giving a deposition?

A Generally.

Q And is there any reason you cannot give us your best testimony today?

A I don't think so.

Q I'd like to start by pulling up a website.

So I am currently typing in "archive.today." Have you seen this website before?

A No.

Q You've never seen this website before?

A I don't think so. Don't remember seeing it.

Q I'd like to direct you to the second line down below the red box. It says -- well, let's start with the first line there:

"Archive.today is a time capsule for web pages!"

Do you see that?

A No. Oh, do I see it now? Yes.

Q Yeah.

"It takes a 'snapshot' of a webpage that will always be online even if the original page disappears."

Do you see that?

please?

A I have to understand what you mean by "banner" there.

Q I'm using your testimony. You're the one who told me you didn't see the banner.

A I didn't see the Archive stuff, yes, is what I told you.

MR. LANGER-OSUNA: Can you hold that up to the video camera and show the jury what you didn't see on what you printed up? Okay. All right.

A (Witness complies.)

Q When did you first see the Twitter post that's captured on the front of this page?

A I don't remember.

Q So if we turn to Interrogatory No. 2 in your responses here that you swore to under penalty of perjury, what is your response to Interrogatory No. 2?

A January 2016.

Q And what is the question there? What is the Interrogatory?

A (Reading):

"State when you first learned of Defendant's textual representation of the WIN Passage on its Twitter page."

Q Does that refresh your recollection that you first saw this on January 2016?

A If that's what I said, then that's what I -- my understanding was at the time. I don't have my stuff with me.

Q You signed this yesterday?

A And? I don't understand the question.

Q You signed a verification swearing under penalty of perjury that everything in here was true and correct, to the best of your knowledge, yesterday, and I'm not following how it is that you're not sure whether or not this is true.

A I get it that you're not sure.

Q So you're not sure whether or not this is true, January 2016?

A No. I suspect that's true.

Q You suspect. Okay.

Did you see --

So that was the first time that you saw this Twitter post; is that correct?

A I suspect that's correct.

Q Well, is there any reason why that's in doubt?

A No, I don't think so.

Q Okay.

So let's turn back to Exhibit 2, which is the

one directly in front of you.

Do you see what it says at the top of this banner here?

A Could you please tell me what the top of the banner is?

Q Sure.

A February 23, '19, is that what you're --

Q That's what we've established as the timestamp of when you printed this document, isn't it?

A I think so, yes.

Q So what I'm referring to as the banner is the strip right below it that has "archive.today, webpage capture" on the left, and on the right it has a date.

Do you see that date?

A Yes, I see it.

Q What is that date?

A March 28th, 2016.

Q Okay.

So the Web page capture from archive.today has a date of March 28th, 2016, right?

A I guess, yes.

Q Do you know what that date refers to?

A I would assume that would be the date that it was archived, but I don't know how archive.today works.

Q And you didn't archive this?

A I didn't archive it. I don't even know what that means. I don't know how to archive it.

Q Okay.

So did you do any investigation as to who might have archived this?

A I just told you I don't know what that means.

Q So that's a "no"?

A I didn't know it was archived, so I don't know how I could investigate it.

Q Okay.

Dr. Bell, what are you doing?

A I was going to make a note.

Q Okay.

That's not part of this process. If you want to make notes or talk to your counsel on a break -- well, I don't know if you should really be talking to your counsel about the substance of our conversation, but those are things you can do on a break.

Right now I'm asking you questions and you're giving me answers. That's all we're doing.

(Whereupon, Mr. Joe Meckes of Squire Patton Boggs entered the room.)

BY MR. LANGER-OSUNA:

Q But before you put that away, are those notes

Have I ever, outside of litigation, entered into a licensing fee for someone to use my work?

Q Social media of any kind online.

A I don't think so.

Q Okay.

Do you know a Coach Joe Tanis?

A No. I know that a coach -- I mean, I know the name, but I don't know him.

Q How do you know the name?

A I've seen that he's posted my work.

(Deposition Exhibit 9 marked for identification.)

BY MR. LANGER-OSUNA:

Q So what we've just marked as Exhibit 9 is a screen capture of a Twitter post dating from November 10th, 2015, on Joe Tanis' Twitter feed @coachTanis.

A Yes.

Q And it features your -- it features something that looks very similar to your "Winning Isn't Normal" passage, correct?

A Yes.

Q And that post has been up since November 10th, 2015, correct?

A Apparently.

Q What efforts have you taken to take this down?

A I haven't yet.

Q You're familiar --

When did you first learn of Coach Joe Tanis?

A I don't know. I assume sometime after 2010 -- November 10th, 2015.

Q Well, you've been actively searching for your "Winning Isn't Normal" passage since at least 2016, correct? January 2016?

A Yeah, I would guess so.

Q Were you actively searching for it before then?

A Yes, I think so.

Q When did you first encounter this post by Coach Joe Tanis?

A I don't know.

Q Why have you left it up?

A Why what?

Q Why have you left this up?

A You'll have to ask him.

Q Have you reached out to him?

A No, not yet.

Q Why have you not reached out to him?

A I'm not obligated to reach out to him, and I don't have time to reach out to all thousands of the

people who've pirated my work.

Q Okay.

But this has been in the top Google feed for quite some time now, hasn't it?

A I don't know the answer to that. I don't know. I haven't the slightest idea --

MR. URBANCZYK: Object to form.

THE WITNESS: -- how Google works.

BY MR. LANGER-OSUNA:

Q But you regularly conduct Google Searches for "Winning Isn't Normal," don't you?

A Yes.

Q Then you would know that this appears near the top of the results because it is one of the first five right now.

A Okay.

Q Well, so --

A And I don't understand your question.

Q Why haven't you --

Why are you leaving this up?

A I'm not leaving it up. He's leaving it up.

Q Why are you not approaching him about taking it down?

A I just told you why. I've already answered that question.

the author and obtain permission or otherwise seek appropriate counsel regarding the use of the materials."

Right?

A Correct.

Q When someone is posting online, are they reprinting?

A My understanding is they are disseminating and displaying Internet content.

Q Is this memo your basis for contending that swim clubs should know better?

A One of them are.

Q What are the other bases?

A Should know better than what?

Q Than to post your materials online.

A Yeah. Yes, partly.

Q What are the other bases?

A Well, most of them have been taught in school; that they don't take credit for other people's work, not to use other people's work as their own.

They certainly have constructive knowledge. All anyone has to do is do an Internet search for "Winning Isn't Normal" and it says -- first thing up in the largest letters on that says it's a sports

psychology book by Dr. Keith Bell. So if anyone lifts a finger to find out, then they know.

Q So have any of the swim clubs reached out to you -- no, we've already established that.

MR. LANGER-OSUNA: I think we've actually been going for an hour and a half now. So let's take a break.

(Recess taken at 11:32 a.m. resumed at 11:48 a.m.)

(Deposition Exhibit 11 marked for identification.)

BY MR. LANGER-OSUNA:

Q What we've just marked as Exhibit 11 is an excerpt from the "Look Inside Feature" for the Kindle book of "Winning Isn't Normal" on Amazon.com.

Take a moment to review it and look up and tell me if you're familiar with this.

A I'm familiar with it.

Q Okay.

So you're aware that Amazon.com makes available what you've called the "WIN Passage" for free, correct?

A Yes.

Q And you also make the WIN Passage available on your website, WinningIsntNormal.com, correct?

A Yes.
Q The whole passage is available for free there on your website?
A Yes. People can find a way to read it for free on my website.
Q The text that we're looking at here in Exhibit 11 from Amazon.com, this is identical to what you contend OCPP posted, right?
A Substantially similar. Maybe identical. I can't remember. No, it's not identical.
Q It's not identical?
A No. Practically identical.
Q How is it different?
A Some of the words are different.
Q What words?
A Well, this -- seven lines from the bottom or six, the seventh line from the bottom, says: "(Now, take note!)" in a parenthetical statement. That's omitted on the other one, for example.
Q What else is different?
A You want me to compare them right now?
Q Yes, please.
A Well, it says -- this one says "every race." That one says "every competition." It also leaves out the parenthetical statement, "(not to mention all those

who tried and failed to make cuts)."

You can see it as well as I can. You see what's different.

Q Okay.

So anyone can see the differences, is what you're saying?

A Yes.

Q And the passage from the Amazon.com website, this is several lines from a larger work titled "Winning Isn't Normal," correct?

A Correct.

Q How many pages is that book?

A That book is -- depending on how they're counted, it's 64 pages or 72 if you include some of the blank pages and matter.

Q And what you're calling the "WIN Passage" is less than one page, right?

A Correct.

Q Do you know what page it's on in your book?

A Originally it was on page 8. Sometimes when we get it in the bookstore, print to order, the pages are numbered differently.

Q But in the original publication, it was on page 8?

A Correct.

was the author. Any Internet search would have shown that I was the author. If wherever they got this from, if it's not from my book or wherever, wherever they got it from, I see no evidence that they asked for permission to use it from anyone.

Q You just raised an interesting point. This image has certain characteristics that are consistent with other images that are available on a Google image search for your "Winning Isn't Normal" phrase, right? The text is at a slant, for instance; is that correct?

A The what is --

Q The text is at a slant.

Do you see that?

A The text is what?

Q At a slant.

A Oh, yes.

Q It appears to be an image of -- I don't know -- a photocopy of a piece of paper or something; is that right?

A Yes, I think that's correct.

Q In all of your litigations, have you ever come to figure out what the origin of this image is?

A No. I have some -- no, I haven't.

Q Do you have any idea what the origin of this image is?

A I have some guesses about what the origin might have been, but I don't know.

Q What are those guesses?

A They're just guesses.

MR. URBANCZYK: Objection to form.

BY MR. LANGER-OSUNA:

Q Please tell me anyway.

A I don't think I have enough -- that my guesses are strong enough to point out.

Q Not giving them any strength or anything like that, I'm just asking what your guesses are.

A It's possible, to me, that it came -- the origin. It's possible, to me, that this particular what I call "crumpled paper" came from Reinhardt University. I have no proof of that.

Q Okay. That's fair.

I was asking you to speculate. That is perfectly acceptable.

What is your --

What leads you to think that might be possible?

A Because it was one of the earliest ones I've found of this.

Q And where did you find that?

A Where did I find it? On a Google Search.

Q So you did a Google Search, you came up with this crumpled piece of paper, and it was posted on Reinhardt University Twitter feed? Instagram? Where was it posted?
A If I recall correctly, it was posted on Twitter and Facebook, but I'm not sure of that.
Q Okay.
Did you sue Reinhardt University?
A Not yet.
Q Why not?
A Because it wasn't what I decided to do first.
Q Okay.
Did you take any PDFs of the image you found on Reinhardt University's Twitter feed or Facebook?
A Yes.
Q Do you still have those?
A I assume so.
Q Okay.
When did you first discover that post by someone on -- from Reinhardt University?
A I don't remember.
Q Can you give an approximate time?
A Early November of 2015.
Q Early November of 2015? Okay.
Other than the instances we've seen from

it online affect the sales of your books?

A I think I just answered that.

Q Do you have any evidence of any individual person, other than, as you claim, OCPP and the people involved with OCPP, not buying your book because of this post?

A I have evidence of millions of copies of -- of uses without my permission of the crumpled piece of paper, the image that Oakland Undercurrent posted.

Q So is that a "no" with respect to my question of do you have any evidence of any individual who, for instance, told you, Oh, I saw that online so I'm not going to buy your book now? Do you have any evidence that this post --

A No.

Q -- caused someone not to buy your book?

A No one has told me that they didn't buy the book because of this particular post.

Q Okay.

Do you have any other type of evidence that would directly show that someone didn't buy the book because of this post?

A Yes.

Q What is that evidence?

A Oakland Undercurrent.

So when you say that they might have bought it or not otherwise, it doesn't matter. They already got the benefit. I mean, when you said -- might not otherwise have bought it, doesn't matter. They already got the benefit.

Q By having read the WIN Passage, they already got the benefit of the book?

A Yeah.

Q Did sales of your book go up, down or stay flat after December 2015?

A I don't know how to answer that.

Q What don't you know how to answer about that?

A Well, I don't have the data in front of me, for one thing, but you said "because of," so I don't know why they went up, down or stayed the same.

Q I'll just ask the question again.

After December of 2015, did sales of your book go up?

A I don't understand that question. What does that mean?

Q Between December 2015 and now, did more people buy your book than before?

A No.

Q Did sales of your book go down after December of 2015?

A Yes.

Q What is your evidence of that?

A Well, I've sold, prior to December '15, at least 40,000 or more books, and I've not sold that many since then.

Q When did you sell those 40,000 books?

A Between 1982 maybe and December 15th [sic].

Q December 2015 you mean?

A Yeah.

Q Were the same number of books being purchased every year between 1982 and 2015, or did the rate of purchase change over time?

A I'm sure it changed over time.

Q It did change over time?

A (Nods head.)

Q Did it increase between 1982 and 2015?

A I don't recall which years it may have or may have not increased.

Q How many books were being sold in 2015?

A Don't know.

Q Do you have an approximate guess?

A No.

Q Do you know how many books were being sold in 2014?

A No.

Q 2013?

A Don't recall. Don't have any data from then.

Q Do you know how many books you sold in 2016?

A No.

Q Do you know how many books you sold in 2017?

A No.

Q Do you know how many books you sold in 2018?

A No.

Q Do you know how many books you sold in 2019?

A No. I don't -- I don't know now.

Q Do you have that data available to you?

A I think I have some data available on what was sold through Kindle or Amazon or iBooks.

Q Do you know if the number of books sold in 2015 was less than the number of books sold in 2016?

A '15 less than '16, is that what you said?

Q (Nods head.)

A I don't know.

Q Do you know if it was greater than the number --

A I don't know. I don't remember.

Q You also talked about lost sales of posters.

Do you have any data on how many posters you've sold over the last 10 years?

A Over the last 10 years?

Q Correct.
A Not exact, I don't think.
Q Would you be able to get data on that?
A Would I be able to guess?
Q Would you be able to get it?
A Some of them.
Q Where would you be able to get that?
A Actually, I'm not sure I'd be able to get that.
Q You also indicated that you thought that the post caused you to lose sales of T-shirts.
Do you have any data on the number of T-shirts you've sold over the last 10 years?
A I don't think I have any exact data. I know it's -- I've sold at least 2 or 3 -- more than 200.
Q When?
A When? In the last few years.
Q What do you mean by "the last few years"?
A Since we started selling T-shirts, and I think I provided that as best I could.
Q You did provide information on that. You started selling T-shirts in approximately 2015.
A 20 --
Q Approximately 2015.
A 2015.

Q That's what you indicated in your Interrogatory responses.

So since approximately 2015, you've sold approximately 200 T-shirts?

A No. I've sold more than 200 T-shirts, but I don't know an exact number. That's my best guess.

Q Less than 300?

A I don't know. I would guess less than a couple thousand.

Q So it's a number somewhere between 200 and a couple thousand?

A Well, you're asking me to guess.

Q This is your business.

A Huh?

Q This is your business. I mean, would anyone else know better than you?

A My wife might.

Q Okay.

But to the best of your knowledge, it's somewhere between 200 and 2,000 T-shirts?

A Yeah.

Q You also indicated that you thought that this post caused you to lose sales of your services?

A Correct.

Q What is the basis for that?

A Well, the basis of that is a lot of people in the past have bought my services after having read "Winning Isn't Normal" and told me that they...

Q And so because this --

So why does this post cause them not to use your services?

A That makes no sense to me. I don't know what you're asking me.

Q Makes no sense to me either.

My question is: You are contending that you lost sales of services because of this post, correct?

A Because of this book? No.

Q Post, of this post.

A I'm -- I'm contending that -- I'm saying that in the past, I regularly sold services because people -- people have told me because of "Winning Isn't Normal." And -- and this post doesn't have my name on it. It doesn't say that services are available or books are available or anything to identify that my services exist.

So they might think this is the most wonderful thing in the world, but they don't know anything exists beyond it or that -- who wrote it because of this post.

Q Okay.

And it's really hard to figure out who wrote

this post, correct?

A No.

Q What do you mean?

A It's not hard if someone is motivated to find out who wrote the post to find it. But if people think this is the only thing that exists, why would they go searching? They already found this post. They already got it for free. They don't know anything else exists, presumably.

Q You also listed in your Interrogatory responses that you sell beverage containers such as mugs; is that correct?

A Yes. We just started selling mugs recently.

Q Are these mugs with "Winning Isn't Normal" on them?

A Yes.

Q And are you contending that --

You only started selling these in February 2019, so I assume you're not contending that this post affected sales of those mugs?

A I don't know if it affected them or not.

Q So you might be contending that? And let me just clarify why I'm asking. Because if that is what you're contending, then I will have to follow up and ask for all the records about your sales of mugs. So just

That's an example. Or -- my experience and my understanding is that there are a lot of people who if there is some -- what's the word -- dispute between two people or entities, there are a lot of people that assume that they're both wrong or they both have some responsibility for the dispute, and they don't want to be involved. All right?

And it's my feeling when people get told things about me that are not true, that they're more likely to -- well, one of the main things is if somebody posts this and it doesn't have my name on it, the passage, then they might think, Did Keith really write this or did someone else write it and Keith stole it?

And I don't want that kind of garbage where they, then, move away from me or not want to be involved or think poorly, possibly, of a friend.

Q So just trying to -- bringing this back to the teams that you did not pursue who posted sections, other than the "Winning Isn't Normal" passage, you did not pursue them because they attribute it to you? I'm trying to understand.

A That's not what I said.

Q Okay.

So explain -- you didn't pursue them because?

A I didn't want to.

Q And you didn't want to because?

A I didn't want to.

Q Because they didn't badmouth you?

A I didn't want to.

Q I'm asking why you didn't want to?

A Well, you're asking me to go back to whenever that was and stuff, and -- and -- and actually, I think in the cases that I've given you, I still am in the statute of limitations if I wanted to go after them, but I haven't wanted to yet.

Q And I'm asking why not?

MR. URBANCZYK: Object to form.

THE WITNESS: I think I explained it as best I can.

BY MR. LANGER-OSUNA:

Q Okay.

You also said that you like it now more than before. And "it" is going after people for this.

Why do you like it now more than before?

A The "it" was what?

Q Going after people for posting the WIN Passage.

A I said I like going -- oh, because some of the damages has already been done.

Q What do you mean by that?

a different set of facts that motivated you to agree to what you did?

A They're all a different set of facts. I know that one of the ones since -- that was this year, settlement this year, was with a school that -- a university that had posted it before and posted it again.

Q Okay.

And what inspired you to create the WIN Passage?

A Oh, my. It's a long, long story, but basically, I got interested in psychology and sports, and I was in class in graduate school and listening to some studies, talking -- class talking about some studies for pain management and for -- for performance anxiety, and I started thinking about applications of that to sports and what would work and what wouldn't and how.

And the fact that everything -- a large part of this was that a fact that everything in psychology in those days was remedial. And I was -- when I started thinking about sports, I was thinking about promote -- promotion. Psychology was in the business of mostly dealing with people who were dysfunctional and helping them to get closer to normal.

And I wanted -- when I started thinking about sports, I wanted to help people get as far away from normal as they possibly could because you don't win acting normal and doing normal things. It takes very special things, doing more and better preparation and things like that. And that it wasn't normal to win. Most people don't win.

And one day I -- there's a lot more to what went into my -- went into my getting there and things I had to create, like getting a grant to fund my work in this area and trying it out on myself, convincing coaches who were, it was my way or the highway, to give me a shot, which they wouldn't have done if I hadn't been a coach and an All-American swimmer. And some other things.

And I tried it on myself. The stuff was working great like crazy. And I was excited about doing it with other people.

THE REPORTER: I'm sorry. I need a break.

(Recess taken at 6:14 p.m.
resumed at 6:18 p.m.)

FURTHER EXAMINATION

BY MR. LANGER-OSUNA:

Q Just a moment ago, you testified that there